FILED
IN CLERK'S OFFICE

2015 DEC  4  AM 10 17

U.S. DIST.
DISTRICT C.

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**INGRID PERSSON**
**3712 Willow Pass Road, #41**
**Concord, California 94519**
**Plaintiff.** *In Pro Per Se*

**V.**

**CIVIL ACTION**

**No._____**

**BOSTON UNIVERSITY**
**One Silber Way, Eighth Floor**
**Boston, Massachusetts 02215**
**Defendant**

## PARTIES

1. The plaintiff is a resident of Concord, Contra Costa County, California, and a citizen of the United States. At the time of the events described below, plaintiff was a resident of Chelsea, Suffolk County, Massachusetts and a citizen of the United States.

2. The defendant, Boston University, and its School of Medicine, is an academic institution and its primary place of business is located in Boston, Suffolk County, Massachusetts.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331, as this case involves a Federal Question.

## PROCEDURAL HISTORY

On September 8, 2015, Plaintiff received notice from the U.S. Equal Employment Opportunity Commission (EEOC) stating that the EEOC had adopted the finding without review of lack of probable cause by the Massachusetts Commission Against Discrimination (MCAD), a

1

state agency for her claim under M.G. L. 151B § 4 (1996), as well as a Federal claim of retaliation under Title VII for having opposed unlawful discriminatory practices at Boston University, specifically at Boston University's School of Medicine, and for having submitted complaints regarding the discriminatory practices. These complaints were submitted to administrative individuals within Boston University, and subsequently to the Massachusetts Commission Against Discrimination in the form of a complaint as a party associated with a protected class who suffered discrimination due to disparity in pay and benefits, as well as a party who had suffered retaliation following complaints made to Boston University officials. Under this EEOC notice, Plaintiff was informed that she had ninety (90) days from the date of receipt to file a claim against the Defendant in the United States District Court, District of Massachusetts. Plaintiff files this complaint on December 3, 2015, within the 90-day period permitted following receipt on September 8, 2015.

The original complaint was filed with the MCAD and the EEOC in June of 20111, and after four years in which this case lingered and eventually passed through the hands of three investigative commissioners at MCAD, the EEOC was informed by MCAD that the Plaintiff's case was denied for lack of probable cause. Plaintiff then appealed to the Full Commission for a review under 804 CMR 1.23(1)(a) due an inadequate review of the matter, as well as multiple errors in the investigative commissioner's factual findings. (e.g., Plaintiff is, in fact, from a mixed-race family as was well known to Defendant, and was treated differently from the only white male in the office. However the investigative commissioner stated that Plaintiff is not from a mixed-race family, in spite of photographic evidence provided substantiating this fact). Plaintiff was informed by the EEOC that this final appeal was denied by the very investigating commissioner who found lack of probable cause. This denial by the investigative commissioner was a violation of Plaintiff's Due Process rights under state law, as the recusal of the investigative commissioner is statutorily-required under Massachusetts state law (804 CMR 1.23(1)(c)).

Plaintiff now seeks redress in Federal court for acts of unlawful retaliation committed by Boston University following complaints made by the Plaintiff regarding discriminatory practices, as the state agency did not adequately review, nor address the Federal claim.

## COMPLAINT

Plaintiff objected to Boston University's *de facto* discriminatory practices as Boston University denied equal pay and benefits to staff in the two separate administrative offices over many years: One, an all-white office located along the Charles River, and the other office, mostly African-American on the other campus located near Dorchester. Boston University paid salaries that were tens of thousands of dollars more to its all-white staff, and offered shorter work hours, with a smaller work load than that afforded to the Plaintiff and her mostly African-American colleagues on the medical campus near Dorchester, Massachusetts.

Boston University retaliated against the Plaintiff for her objections and her submissions of formal complaints by first denying a well-deserved promotion, then by threatening the Plaintiff prior to a hearing before a state agency on the initial matter.

Plaintiff's objections to this practice were made known to her direct supervisors as early as 2008. But on November 16, 2010, Plaintiff related these objections to an outside investigative group. This group subsequently provided a report to Boston University officials outlining their findings, including disparities in salary and benefits they noted between the two offices charged with research administration.

On January 4, 20111, Plaintiff applied for a promotion, having received high praise for her work which included successful negotiations of two large government contracts that brought greater fame and prestige to Boston University and its researchers. On January 26, 20111, Plaintiff met with the newly hired Vice President of Research, Michael Collins. At the first individual meeting with Mr. Collins, he inquired as to what changes Plaintiff might envision to improve the office. Plaintiff told Mr. Collins of the disparity in pay and benefits, that this disparity was leading to a demoralization of the staff, and that this matter was a priority. Mr. Collins told the Plaintiff that she was wrong on all counts. He also told Plaintiff that he was aware of her application for a promotion, and that it would only be reviewed by him.

On February 23, 2011, Mr. Collins assaulted the Plaintiff by raising his hand to her face as he was seated next to her during a staff meeting and yelled at her following her quiet objection to his assertion that the (mostly African-American office) did "nothing right." Plaintiff will

3

provide evidence based on statistical data that shows that the mostly African-American office out-performed their all-white counterparts.

On March 4, the only white male research administrator in the office announced that Mr. Collins had issued an order through him, a colleague, that we were to ignore the federal-mandated requirements for review of human subject research prior to the release of research funding. This individual was well-liked by Mr. Collins and singled out for upper-management meetings. This order was given only to the Plaintiff, her colleagues and their direct supervisor, but not to the all-white office.[1]

On March 16, 2011, Mr. Collins came to Plaintiff's office after having reiterated his statement that the mostly African-American office did "nothing right." This Vice President for BU told the Plaintiff that "all you have to do is walk through the door at this (African-American) office and walk through the door at the other office (all-white), and you can see the difference."

Plaintiff's direct supervisor, Dr. Jane Kinsel, requested Plaintiff's assistance in supporting her allegations of discriminatory practices with Boston University's own internal EEOC office, and on May 20, 2011, Plaintiff responded to an inquiry from this EEOC office prompted by that work. In it, Plaintiff outlined a number of complaints about discriminatory practices, including the salary and benefit disparities between the two offices that were functional equivalents.

On June 1, 2011, Plaintiff was introduced to the individual who was given the job opportunity that the Plaintiff had sought as a promotion. Boston University's employment policy manual outlines a requirement for an interview for all internal candidates, as well as a preference for an internal candidate over an external candidate. The person Mr. Collins hired was an old friend of his who had been fired from her previous place of employment. Once hired, she had the title and the salary, but was only asked to do data entry, suggesting a lack of confidence in her skill set.

---

[1] Plaintiff refused the order as human lives were put at risk, and out of safety concerns due to the pending opening of the bio-level 4 lab in the center of Boston, along a well-travelled freeway, in close proximity to Logan International airport. Plaintiff filed an allegation with the federal Department of Health & Human Services, citing a number of violations based on records gleaned from BU's own data. Plaintiff was informed by a former colleague after her departure from BU that the office spent months "cleaning up the mess," and providing IRB protocols for research already funded. The DHHS did issue a finding of a violation of 45 CFR 46.103(b) and 46.109(a), but on the basis of one project that somehow missed the "clean-up" (cover-up) process. (Attached as Exhibit A)

4

June 7, 2011, Plaintiff submitted an email to the internal EEOC office, outlining her belief that the failure to promote, without even the opportunity to interview for the position had been retaliation for Plaintiff's allegations.

On June 17, 2011, Plaintiff filed her complaint with the Massachusetts Commission Against Discrimination, alleging a state claim for association-based discrimination, as well as retaliation.

On July 20, 2011, approximately one month after Plaintiff filed her complaint with the state agency, Plaintiff and her colleagues were given raises as an "adjustment" to their pay. This "adjustment" did not address back pay for lost wages due to the disparity in salary, nor did it adjust the other benefits to match those enjoyed by the all-white office. It also did not address the obvious racial animus that Plaintiff and her colleagues perceived from the Vice President of Research, Michael Collins. After presenting Plaintiff with the letter notifying her of the "adjustment," Mr. Collins told the Plaintiff that she needed to move on and forget the past. Plaintiff felt that there were sufficient unresolved issues remaining that it should be resolved by an independent, outside agency.

Plaintiff was also concerned that as soon as the complaint was dropped with the state agency, BU might use this opportunity to "punish" Plaintiff. This was not an unreasonable concern, because on the day that the adjustments were announced, Plaintiff's supervisor was fired, presumably for having filed the internal EEOC complaint.[2]

A hearing was scheduled at the MCAD offices in the matter of Persson v. Trustees of Boston University for September 21, 2011. On September 16, 2011, just five calendar days before that hearing, Mr. Collins called Plaintiff into his office, and when Plaintiff entered, he got up from his desk to shut the door, and then told the Plaintiff that she had "better watch her mouth – or else." Plaintiff phoned the MCAD office to relate this incident and was told by the investigating commissioner handling the matter at the time that an amended complaint should be filed, and to do so on the morning of the upcoming hearing.

On September 21, 2011, Plaintiff arrived at the MCAD offices, but was shaken following the threat. As Plaintiff was filing the amended complaint, Mr. Collins stood menacingly outside

---

[2] Jane Kinsel, Ph.D. eventually settled her wrongful termination complaint out of Court for an undisclosed amount.

the glass-paned door of the intake room, glaring at the Plaintiff with his hands on his hips. Plaintiff had an emotional breakdown, and was advised by the investigative commissioner to go home. The hearing took place in Plaintiff's absence. Plaintiff was told at the time the she would be permitted a hearing date in the future. BU simply denied all allegations. Plaintiff was never again permitted the opportunity to appear in person, in spite of earlier assurances by the first investigating commissioner.

Following an incident during the summer months, Plaintiff was diagnosed with a brain disorder that has the potential of resulting in stroke or death, and her physician advised Plaintiff to try to reduce stress from work-related issues. Following the above incident on September 21, 2011, Plaintiff was diagnosed by her physician with PTSD and advised to take a leave of absence due to the complicating factor of small vessel disease. The FMLA leave was approved by BU's Human Resources office, based on the physician's findings. Plaintiff was advised by BU's HR that all communications would remain confidential.

Following a phone call Plaintiff received at home from work while out on leave, Plaintiff called the HR office to inform a staff member there of the violation of the terms of the FMLA leave. A few days later, Plaintiff received a phone call from the same HR staff member, asking her to consider the offer now being made by the attorney for Boston University handling BU's defense of the complaint at the state agency. The offer from the attorney directed the Plaintiff to resign from BU, and in exchange, Plaintiff would then be "allowed" to receive unemployment benefits. The HR staff person suggested to an emotionally frail Plaintiff that she could "make this all go away" by just accepting BU's offer of unemployment benefits if Plaintiff quit. Plaintiff refused the offer, knowing that BU has no authority to grant or deny unemployment benefits.

Plaintiff was told by BU's HR personnel that the only way to return to work would be with a letter from the Plaintiff's physician releasing her back to work. Plaintiff's physician would not provide this letter, as the Plaintiff would be forced to return to the same environment, with the same Vice President, and would likely be exposed to the same stressors that caused the PTSD. BU's HR subsequently demanded that Plaintiff return nonetheless, even without a release, stating that BU did "not need any more paperwork from the doctor." On December 31, 2011, Plaintiff submitted her resignation, citing health concerns.

6

Plaintiff did file for unemployment benefits on the basis of constructive discharge. BU initially fought those benefits, but shortly before a DUI hearing on the issue, BU rescinded its opposition. After waiting for three months, Plaintiff finally began received unemployment benefits, having provided a number of documents supporting the claim.

But for the Plaintiff's steadfast refusal to "watch (her) mouth" when confronted with the fact of discriminatory practices at Boston University in violation of Title VII protections, the retaliatory denial of a promotion and the subsequent threat made to the Plaintiff directly by Michael Collins, a BU employee, just prior to a hearing on the matter, would never have occurred.

## RELIEF REQUESTED

Plaintiff seeks compensation in the amount of $500,000 for loss of wages following her constructive discharge, for the retirement benefits that were spent down while waiting for an unemployment decision, and for the turmoil Plaintiff suffered as a result of Boston University's campaign of retaliation against the Plaintiff. Plaintiff also seeks punitive damages, to be determined by a jury.

Dated: December 3, 2015.                                Respectfully submitted,

Ingrid Persson
Plaintiff, *In Pro Per Se*

7

*EXHIBIT A.*



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Secretary
Office of the Assistant Secretary for Health

Office for Human Research Protections
The Tower Building
1101 Wootton Parkway, Suite 200
Rockville, Maryland 20852
Telephone: 240-453-8132
FAX:   240-453-6909
E-mail: Kristina.Borror@hhs.gov

January 10, 2013

Thomas J. Moore, M.D.
Associate Provost
Boston University Medical Center
Boston U Med Campus
72 East Concord St. E-712
Boston, MA 02118-2526

**RE: Human Research Protections Under Federalwide Assurance FWA-301**

Research Project: **MCH Research**
Principal Investigator: **Dr. Howard Cabral**

Research Project: **Prenatal Cocaine Exposure: Adolescent Follow-Up**
Principal Investigator: **Dr. Christine Chaisson**
HHS Protocol Number: **5R01DA006532**

Research Project: **Cell Based Therapy for Cigarette Smoke-Related Lung Disease**
Principal Investigator: **Dr. Andrew C. Wilson**

Research Project: **Research Ethics & Safety Promoted by Embodied**
**Conversational Technology (RESPECT)**
Principal Investigator: **Dr. Christine Chaisson**
HHS Protocol Number: **5R01CA158219**

Research Project: **Biology of the Lung: A Multidisciplinary Program**
Principal Investigator: **Dr. David Center**
HHS Protocol Number: **2T32HL007035**

Research Project: **BMP7 in Melanoma Niche Morphogenesis & Homeostasis**
Principal Investigator: **Dr. Mei-Yu Hsu**
HHS Protocol Number:  **7R01CA138649**

Dear Dr. Moore:

Thank you for your April 13, 2012 report in response to our February 10, 2012 request
that Boston University Medical Center (BUMC) evaluate allegations of noncompliance
with Department of Health and Human Services (HHS) regulations for the protection of
human research subjects (45 CFR part 46). Based on review of your response, we
make the following determinations:

Determinations regarding the above-referenced research:

The complainant alleged that grant award monies are being released to investigators
prior to institutional review board (IRB) review and approval. Based on information
received in connection with our evaluation of this allegation, we have determined that
non-exempt human subjects research was conducted without IRB review or approval,
in contravention of HHS regulations at 45 CFR 46.103(b) and 46.109(a). Specifically,
you acknowledged that a research project conducted by a trainee under the grant award
2T32HL007035 (Biology of the Lung: A Multidisciplinary Program") was begun prior
to IRB review and approval. We acknowledge that there is no evidence that any of the
other studies noted above were conducted prior to IRB review and approval.

**Corrective action:** We acknowledge your institution's plan to notify all T32 directors
and research mentors to underscore that they are responsible for assuring that all
trainees' human research has IRB approval. We also acknowledge your plan for
clarifying the difference between conditional and final approval, which appears to have
been the problem which lead to the regulatory violation. In addition, you noted that
both BUMC and Boston University's grants office will create monthly reports
describing the number of awards that are allowing access to funds but do not yet have
IRB approval and the results of the review of charges against those grants, and send
those reports to your office, as Institutional Official.

We determine that the corrective actions adequately address the determinations. At this
time, there should be no need for further involvement by our office in this matter.
Please notify us if you identify new information which might alter this determination.

We appreciate the continued commitment of your institution to the protection of human
research subjects. Please do not hesitate to contact me should you have any questions.

Sincerely,

Kristina C. Borror, Ph.D.
Director, Division of Compliance Oversight

cc:

Ms. Mary A. Banks, IRB Director, Boston University Medical Center (BUMC)

Dr. Lynn Borgatta, IRB Chairperson, Boston U Med Ctr IRB - Green

Dr. James Feldman, IRB Chairperson, Boston U Med Ctr IRB – Blue

Dr. Sanford Auerbach, IRB Chairperson, Boston U Med Ctr IRB – Purple

Dr. David Kaufman, IRB Chairperson, Boston U Med Ctr IRB – Orange

Dr. Howard Cabral, Associate Professor, Biostatistics, Boston University School of
    Public Health

Dr. Christine Chaisson, Research Assistant Professor, SPH Data Coordinating Ctr, BU

Dr. Andrew C. Wilson, Assistant Professor, Cntr Med--Pulmonary Center, BU

Dr. David Center, Professor, Cntr Med--Pulmonary Center, BU

Dr. Mei-Yu Hsu, Principal Investigator, Clin—Dermatology, BU

Dr. Margaret Hamburg, Commissioner, Food and Drug Administration (FDA)

Dr. Joanne Less, FDA

Dr. Sherry Mills, National Institutes of Health (NIH)

Mr. Joseph Ellis, NIH

Dr. Harold Varmus, Director, National Cancer Institute, National Institutes of Health
    (NIH)

Dr. Susan Shurin, Director, National Heart, Lung, and Blood Institute, NIH

Dr. Nora D. Volkow, Director, National Institute on Drug Abuse, NIH