UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

INGRID PERSSON,                  )
                                 )
                    Plaintiff,   )
        v.                       )        CIVIL ACTION
                                 )        NO.  15-14037-JGD
BOSTON UNIVERSITY,               )
                                 )
                    Defendant.   )


# MEMORANDUM OF DECISION AND ORDER
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

February 25, 2019

DEIN, U.S.M.J.

## I.  INTRODUCTION

The pro se plaintiff, Ingrid Persson, has brought suit against her former employer,
Boston University ("BU" or "the university"), primarily over incidents that took place in her last
year of employment with the university.  The plaintiff, a white female, alleges that she and her
coworkers were paid less than their counterparts in another office because the plaintiff's office
was majority African-American.  She further alleges that because she spoke out about this racial
discrimination, as well as new practices at BU that she believed would violate federal
regulations, she was bullied, threatened, and passed over for a position she had applied for.
The plaintiff also asserts that she was constructively discharged from her position.  Nearly four
years after leaving BU, the plaintiff filed the instant action against the defendant, asserting the
following causes of action: discrimination under Title VII of the 1964 Civil Rights Act ("Title VII");

discrimination under Mass. Gen. Laws ch. 151B, § 4; retaliation under Title VII; retaliation under the False Claims Act ("FCA"); and violations of the Family and Medical Leave Act ("FMLA"). [1]

This matter is presently before the court on the "Plaintiff's Motion for Summary Judgment" (Docket No. 77) and the defendant's "Motion for Summary Judgment" (Docket No. 73). Both parties seek summary judgment on all of the claims asserted. [2] For the reasons detailed herein, the defendant's "Motion for Summary Judgment" (Docket No. 73) is ALLOWED and the "Plaintiff's Motion for Summary Judgment" (Docket No. 77) is DENIED.

## II.   STATEMENT OF FACTS[3]

Under Local Rule 56.1, a motion for summary judgment must include a "concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions and other documenta-tion." A party's failure to do so "constitutes grounds for denial of the motion." L.R. 56.1. Similarly, a party's opposition to a motion for summary judgment must provide the court with a "concise statement of the material facts of record as to which it is contended that there exists a

---

[1] In the Amended Complaint, Persson asserts that one of her causes of action is for BU's denial of "the due process required under Boston University's hiring policies at the time that the Plaintiff was employed." (Docket No. 19 at 13). To the extent that the plaintiff intended to make out a due process claim, she appears to have abandoned it and this court need not address it. See In re Mercurio, 402 F.3d 62, 64 n.1 (1st Cir. 2005) (arguments not briefed or argued are waived).

[2] In her Motion for Summary Judgment, the plaintiff does not explicitly state that she is seeking summary judgment on her claim of discrimination under Mass. Gen. Laws ch. 151B, § 4. To err on the side of caution, however, this court will assume that she is seeking summary judgment on this claim as well.

[3] Unless otherwise indicated, the facts are derived from "Defendant's Statement of Undisputed Material Facts" (Docket No. 76) ("DF _") and attached exhibits ("DEx. _"); the exhibits attached to "Plaintiff's Memorandum in Support of Plaintiff's Motion for Summary Judgment" (Docket No. 78) ("PEx. _"); "Plaintiff's Statement of Material Facts" (Docket No. 79) ("PF _"); "Defendant Trustees of Boston University's Response to Plaintiff's Statement of Material Facts" (Docket No. 82) ("DR _"); and "Plaintiff's Memorandum in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment" (Docket No. 83) ("POpp. _") and attached exhibits ("POppEx. _").

genuine issue to be tried, with page references to affidavits, depositions and other documentation." Id. Failure to do so results in the moving party's facts being deemed as admitted. Id. ("Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties."). Moreover, courts do not consider hearsay on motions for summary judgment. Davila v. Corporacion De P.R. Para La Difusion Publica, 498 F.3d 9, 17 (1st Cir. 2007) ("It is black-letter law that hearsay evidence cannot be considered on summary judgment.").

Here, the "Plaintiff's Statement of Material Facts" (Docket No. 79) repeats the allegations in her complaint (along with the defendant's answer) without any citations to the record. Instead, the plaintiff has submitted a number of exhibits attached to her various pleadings. "This court is mindful that plaintiff is proceeding *pro se*," and thus "[her] pleadings are entitled to liberal construction." Geas v. DuBois, 868 F. Supp. 19, 22 (D. Mass. 1994). However, Ms. Persson "is a law school graduate who should have the ability and who has had the opportunity to comply with the requirements of [the local rules]." Ziegler v. Norton, No. CIV. 04-4098, 2006 WL 571866, at *1 (D.S.D. Mar. 6, 2006); see Worlds v. Thermal Indus., Inc., 928 F. Supp. 115, 122 (D. Mass. 1996) ("While this Court is mindful of its duty to construe liberally the pleadings of a *pro se* plaintiff, it cannot turn a blind eye to the clear mandate of procedural rules."). Nevertheless, the court has reviewed and analyzed the exhibits submitted by both parties and, as detailed below, determined that the material facts are not in dispute.[4]

---

[4] The plaintiff objects to the admissibility of a number of exhibits submitted by the defendant in support of its motion for summary judgment. First, the plaintiff asserts that Defendant's Exhibit 5, a transcript of the plaintiff's deposition, is inadmissible because she did not receive a copy and found a typographic

**Plaintiff's Employment History**

In 2000, the plaintiff was hired by BU's School of Medicine in the Department of Dermatology as an administrative secretary. (DF ¶ 2). In 2008, the plaintiff joined what was then known as BU's Office of Research Administration (ORA),[5] which provided technical and administrative support to researchers on BU's medical campus who were engaged in the preparation and submission of research proposals, and also assisted in the management of funded research projects. (DF ¶ 3; DEx. 9 at 3). During the period relevant to the instant action, five of the seven workers in the plaintiff's new office were African-American. (DEx. 5 at 17). The plaintiff was one of two white employees in the office. (Id.).

One aspect of the job for ORA staff members involved providing researchers with source numbers, which gave them access to the funds for their research project. (See DEx. 29 at 2). Research projects involving human subjects had to be reviewed and approved by an

---

error in the transcription. (See Docket No. 84). This court takes notice of the typographic error, but the plaintiff has not provided any substantive reason why the deposition would not be admissible. If anything, the admission of the deposition helps the plaintiff, who failed to provide the court with a sworn affidavit as to any of the allegations underlying her claims.

The plaintiff also objects to the use of Defendant's Exhibits 11 through 18, arguing that these exhibits, which highlight the plaintiff's pre-existing unhappiness with her job and friction with her then-supervisor, are not relevant to the instant action. However, this information is plainly relevant to the question of whether the plaintiff was mistreated by the defendant once she allegedly began advocating for her African-American coworkers, or if her allegations instead stem from a broader, chronic history of unhappiness with her own position and salary. Additionally, the plaintiff argues that these exhibits lack foundation because she refused to authenticate them during her deposition testimony, even though she now appears to concede their authenticity. (See id. at 4). The plaintiff cannot have it both ways, and the court will consider these exhibits in ruling on the cross-motions.

Lastly, the plaintiff objects to Defendant's Exhibit 36. (Id. at 3). The exhibit merely provides a chart of her office's organizational structure and an overview of the office's responsibilities. This exhibit did not go to any material factual dispute in the case and was not pertinent to the court's analysis.

[5] As explained in more detail below, the ORA was later renamed to "Office of Sponsored Programs-MED" (OSP-MED), and was sometimes referred to as simply "OSP."

Institutional Review Board ("IRB"), unless definite plans for the involvement of human subjects had not yet materialized.  See 45 C.F.R. §§ 46.102, 46.109, 46.118.

In December 2008, the plaintiff received a performance evaluation of her work as a research administrator.  (See DF ¶ 4; PEx. 7 at 5; DEx. 10).  She subsequently wrote a letter expressing her displeasure with her evaluation, indicating that she believed "some of [her] value may have been overlooked."  (DEx. 10).  Shortly thereafter, in January 2009, the plaintiff emailed Boris Lazic, then-Director of Personnel at BU, stating, "I am concerned about my job – everybody is."  (DF ¶ 4; DEx. 11).  She explained that the assistant director, Tony Rufo, would not allow the plaintiff to take over all of the duties of a research administrator who was out on leave, and that "if this is the kind of decision-making that is leading the way . . . I'm out of a job that I am well-qualified for, and well-trained to do."  (DEx. 11).  Six weeks later, the plaintiff again emailed Mr. Lazic, asking if he would serve as a reference for her as she applied to other jobs.  (DF ¶ 4).  In so doing, she cited her "concerns about the direction management is taking here in ORA[,]" and, more specifically, the fact that management was intending to hire someone for an open position from outside of the department, rather than promoting from within.  (DEx. 12).

On April 28, 2010, the plaintiff emailed Mr. Lazic to express her displeasure at a recent redistribution of the office workload that she viewed as a demotion.  (DF ¶ 6; DEx. 13).  She also speculated that her performance evaluations, which stated that she "meets expectations" and/or "exceeds expectations," were aimed at "keeping [her] at a certain level" within the office.  (DEx. 13; see PEx. 7 at 7-9 (2009 performance evaluation)).  She indicated that she was thinking of applying for a position on BU's Charles River Campus ("CRC").  (DEx. 13).

On June 23, 2010, the plaintiff provided Human Resources ("HR") with a work diary that she had been keeping on a personal flash drive. (DF ¶ 7). The diary entries primarily focus on the conduct of the plaintiff's then-supervisors, Jane Kinsel and Tony Rufo, who she believed were mismanaging the office. (See DEx. 15). The diary criticized what the plaintiff perceived to be "attacks on individuals in staff meetings, especially if anyone offers an opinion or suggestion that runs counter to [Dr. Kinsel's] decision-du-jour," and described one "verbal attack" at a staff meeting as "terribly unpleasant, very upsetting." (DF ¶ 8). She also noted in her diary that one area of concern was the providing of "source numbers . . . without IRBs in place." (Id.).

In multiple entries, the plaintiff complains about being paired with an African-American coworker who she believed "ma[d]e a racially divisive comment" to the plaintiff on the coworker's first day of work. (DF ¶ 9; DEx. 15 at 4, 5). Multiple diary entries focused on the fact that when she brought this to Dr. Kinsel's attention, Dr. Kinsel refused to pair her with someone else. (DEx. 15 at 4, 5). She also stated that she was "concerned about retaliation," and did not want to be fired. (DF ¶ 9; DEx. 15 at 6).

On August 12, 2010, the plaintiff emailed Mr. Lazic that she was looking for jobs outside of her office due to "the kind of erratic, defensive behavior on [Dr. Kinsel]'s part[.]" (DF ¶ 11; DEx. 16 at 1). She attached a document chronicling that Dr. Kinsel had remarked that the plaintiff "had problems with everyone in this office," and that Dr. Kinsel was planning to discuss her with HR. (DF ¶ 11). She also provided Mr. Lazic with new diary entries, including an email that she believed "is indicative of one of the many reasons why OSP is always having to answer for incompetence or sheer stupidity." (DEx. 16 at 2).

In December 2010, the plaintiff complained to Mr. Lazic about her most recent yearly performance evaluation. (DF ¶ 13). She again stated her belief that she was receiving mediocre performance reviews so as to keep her at the same salary level. (DEx. 17). She told Mr. Lazic that "[t]here are so many things that occur in OSP that I have to simply ignore for my own well-being." (Id.). Additionally, she referred to the prospect of a salary increase as "the same empty promise that was made to me last year." (DF ¶ 13). She also noted that she was starting another round of job applications and stated that the "office is managed so poorly, and I have more to give to BU." (Id.; DEx. 18).

In or around January 2011, one of the plaintiff's coworkers, Lance Mulleneaux, told the plaintiff that her "squeaky-wheel approach may cause others to get the impression that [she is] simply dissatisfied in general, and that [she] won't find happiness in any job." (DEx. 19). The plaintiff responded via email on January 18, 2010, stating that any such person didn't under-stand her motives, and that "I believe that individuals should not have to be belittled by their bosses, that equal pay for equal work should be expected, and that fair treatment of employees in general is essential to a productive workplace." (Id.). She further stated, "[a]t this office, I have been over-looked, under-compensated, bullied, and abused." (Id.; DF ¶ 14).

On January 4, 2011, the plaintiff applied to the position of Assistant Director of Proposal Development. (DF ¶ 20). BU asserts, but the plaintiff disputes, that Joan Kirkendall, who was responsible for initial applicant screening, chose not to interview any candidates, including the plaintiff. (DF ¶ 20). The plaintiff's failure to be hired for this position forms the basis of some of her complaints.

## BU's Restructuring of the Plaintiff's Office

During the plaintiff's tenure at the ORA, in August 2009, the office was renamed "Office of Sponsored Programs-MED" (OSP-MED), mirroring the naming of BU's counterpart office on the Charles River campus, Office of Sponsored Programs-CRC (OSP-CRC). (DF ¶ 5). After the renaming, both offices began reporting to Dr. Ara Tahmassian, the Associate Vice President for Research Compliance. (Id.).

In November 2010, evaluators from other universities performed a peer review of OSP-MED and OSP-CRC. (See PEx. 3 at 1; DEx. 20 at 1). The resulting report, dated December 14, 2010, assessed the differences between the two offices. In terms of performance, the report noted that OSP-CRC enjoyed higher user opinion, and appeared to be operating "far more effectively" than OSP-MED, while noting that this may be due to differences between the focuses of the two offices. (PEx. 3 at 3; DEx. 20 at 3). The report indicated that both BU's medical campus community, as well as OSP-MED staff "were far more critical of the operations, policies, and practices of [OSP-MED] than of [OSP-CRC]." (Id.). Moreover, the report noted that BU's academic community "complains about the excessive time for source (account) establishment especially on the [medical campus]." (Id.). Later on, the report specifies that the BU community "complains of prohibitions on source set up until all regulatory approvals have been obtained, even if these approvals are only required for out years." (PEx. 3 at 4; DEx. 20 at 4).

In terms of support and resources among the two offices, the report explained job titles were different and the salary structure was "much lower" at OSP-MED than at OSP-CRC. (PEx. 3 at 2; DEx. 20 at 2). Employees at OSP-MED held the titles of "Research Administrator" or "Senior Research Administrator," while employees at OSP-CRC held the titles of "Associate

Director" or "Senior Associate Director." (See PEx. 4, 5). The report also noted the high degree of turnover at OSP-MED, and explained that "some of the turnover may have been due to the fact that individual's [sic] skills were insufficient for the responsibilities of the positions, however, the low salaries and position titles in contrast to OSP CRC have clearly played a significant role." (PEx. 3 at 4; DEx. 20 at 4). Additionally, the report indicated that "[t]he [OSP-MED] staff are very concerned with a lack of support staff and basic equipment and supplies." (Id.). The report recommended that "[p]osition descriptions, responsibilities, and job titles for all staff at all OSP sites should be equalized." (PEx. 3 at 5; DEx. 20 at 5). Further, it stated that "the mismatch between titles and salaries between the OSP offices needs to be addressed." (Id.).

On January 24, 2011, one of the plaintiff's colleagues in OSP-MED submitted a written complaint of race discrimination and retaliation against Dr. Ara Tahmassian to BU's Equal Opportunity Office ("EOO"). (See DEx. 31). The complaint alleged that the pay disparity between the OSP-MED campus and the OSP-CRC campus constituted race discrimination and that the complainant was retaliated against for raising the issue. (Id.). Additionally, three of the plaintiff's colleagues on the OSP-MED campus submitted a letter on May 26, 2011 outlining concerns about the inequities between OSP-MED and OSP-CRC, including that the inequities may have a basis in race, as well as concerns about the treatment of OSP-MED staff. (See DEx. 32 at 1). The EOO found that while salary disparities existed between the two groups, race was not a contributing factor. (DF ¶ 29). The EOO concluded that the most important contributing factor to the disparity was the "difference in funding sources, available resources, and

processes" between the two campuses and noted that OSP-MED did not perform the same range and scope of activities as OSP-CRC.  (DF ¶ 29).

**Arrival of Michael Collins**

After the issuance of the peer review report on OSP-MED and OSP-CRC, in January 2011, BU appointed Michael Collins as Assistant Vice President for Sponsored Programs.  (DF ¶ 15). Mr. Collins was directed to merge OSP-MED and OSP-CRC into a single unit.  (Id.).  He received feedback from researchers on BU's medical campus that there was significant dissatisfaction with the services provided by OSP-MED.  (Id.).

Mr. Collins solicited feedback from employees on both OSP campuses about existing problems and proposed solutions.  (Id.; DEx. 9 at 6).  The plaintiff provided Mr. Collins with written responses via email on January 26, 2011 and thanked him for the opportunity to offer such feedback.  (DF ¶ 16; PEx. 10; DEx. 21).  In her responses, the plaintiff stated that the "tone" in the office "needs to change."  (PEx. 10 at 3; DEx. 21 at 3).  She went on to state that, "to be perfectly blunt, there are individuals who are 'heard' by management, and then there are those whose opinions are not as valued."  (Id.).  She also noted the problem of "[i]nequity between the OSP-CRC office and the OSP-Med office," which she characterized as "one of the biggest and thorniest issues."  (Id.).  She listed her proposed solution as "[e]quity, sooner rather than later."  (Id.).

The plaintiff asserts, but the defendant denies, that on March 4, 2011, Nick DiPersio, the other white employee in OSP-MED, announced that Mr. Collins instructed the office to release funding to grant recipients, i.e., provide them with source numbers, without first reviewing whether the grant had received IRB approval.  (PF ¶ 12).

On March 16, 2011, after a staff meeting, Mr. Collins stopped by the plaintiff's office to follow-up on comments she had made in the meeting and reiterated that people should come to him with any concerns or suggestions for improvement. (DEx. 22). The plaintiff told Mr. Collins that she "disagreed with his decision to forego assurances," but "acknowledged that since [she is] not the boss [she was] respectfully disagreeing." (Id.). The next day, the plaintiff sent an email to her supervisor, Dr. Kinsel, about Mr. Collins's visit to her office, stating that "[i]t was actually a good chat, in spite of my concerns about the way things are being handled."[6] (Id.; DF ¶ 17). She explained that Mr. Collins had said that the culture in the office needed to change, and that the plaintiff believed "he may be referring to the tendency to talk more than we walk sometimes." (DEx. 22). She mentioned that her coworkers had quickly spread the news that she had spoken with Mr. Collins, and that, "the time it took to go around talking to my co-workers about what may or may not have been said . . . could have been used to do another award. I think this may be part of what [Mr. Collins is] getting at." (Id.). She ended the email by writing, "I vehemently disagree with harsh tactics (and questionable 'rulings' on our compliance responsibilities), but maybe this office does need to change." (Id.).

On March 21, 2011, Mr. Collins sent an email to BU researchers and department administrators, soliciting information on the top three changes that would make it easier to conduct research at BU, and promised to improve operations in OSP-MED. (DEx. 23; DF ¶ 18). He also announced a change in policy, wherein source numbers would be provided within five business days of receiving an executed award. (DEx. 23).

---

[6] In her deposition, the plaintiff states that her comment about having a "good chat" with Mr. Collins was "facetious" and "tongue-in-cheek." (DEx. 5 at 17). However, she does not otherwise appear to dispute the content of the email. (See id.).

In the spring of 2011, Mr. Collins reopened the search for candidates for Assistant Director of Proposal Development, the position to which the plaintiff had applied in January. (DF ¶ 21). Ms. Kirkendall did not recommend that Mr. Collins consider any of the candidates who had applied earlier, both internal and external. (DF ¶ 21). By May 9, 2011, the defendant decided to offer the position to Monica Russell, an external candidate with eight years of prior experience in research administration at Tufts Medical Center. (DF ¶ 22).

On May 16, 2011, Mr. Collins told Dr. Kinsel that, based on his experience attending her staff meetings, as well as comments received from many of the staff, he wanted Dr. Kinsel to stop holding weekly staff meetings. (DF ¶ 19). In response to this interaction, and although the plaintiff had been a vocal critic of Dr. Kinsel's meeting style, the plaintiff emailed Dr. Kinsel and told her that "[t]he lack of integrity and callous unprofessionalism shown by Michael Collins is stunning." (Id.).

The next day, the plaintiff submitted a complaint to Dr. Karen Antman, Dean of the School of Medicine, concerning Mr. Collins. (DF ¶ 24). She explained that she initially had limited contact with Mr. Collins and that "[i]t was not until he began attending our weekly staff meetings that I began to form a very unfavorable opinion of him . . . ." (PEx. 21 at 1; DEx. 29 at 1). Her complaint then provided a bullet point list, akin to her previous work diary entries, of each instance wherein she believed Mr. Collins exhibited inappropriate behavior. (PEx. 21 at 2; DEx. 29 at 2-3). She indicated that in a staff meeting held on February 23, 2011, Mr. Collins told OSP-MED staff that they did "nothing right." (PEx. 21 at 2; DEx. 29 at 2). The plaintiff asserted that when she asked him for specific examples, he put his hand up towards her face and yelled "no" in response. (Id.). She also alleged that Mr. Collins had ordered the staff to provide

source codes to researchers that she believed would result in violations of federal regulations. (DF ¶ 24).

On May 20, 2011, the plaintiff also contacted the EOO, alleging multiple Title VII violations involving discrimination on the basis of race, harassment on the basis of gender,[7] and hostile work environment discrimination on the basis of religion.[8] (PEx. 11 at 1, 2; DEx. 30 at 2, 3). The plaintiff stated that while her first individual meeting with Mr. Collins had gone fairly well initially, she learned that he wouldn't make eye contact with her African-American coworkers. (DEx. 30 at 2). She also alleged that Mr. Collins showed favoritism to the one white male in the office. (Id. at 2-3). Further, she mentioned Mr. Collins's reference to the office's culture during their March 16 conversation, and asserted that he had also said that "all you have to do is walk through the door at the CRC campus office and you'll see the difference." (Id. at 3).

On June 7, 2011, the plaintiff supplemented her claims to the EOO, alleging that Mr. Collins had also retaliated against her by "choos[ing] not to pursue [her] candidacy" for the position of Assistant Director of Proposal Development. (PEx. 12).

In a letter dated July 5, 2011, Dr. Tahmassian responded to the plaintiff's letter to Dean Antman regarding her concerns about regulatory compliance. (DF ¶ 30). Dr. Tahmassian stated that "it is not a violation of federal regulations to release funds for those portions of a study

---

[7] The plaintiff asserted that Mr. Collins harassed both herself and Dr. Kinsel on the basis of their gender. (PEx. 11 at 2; DEx. 30 at 3-4). In support of these assertions, she alleged that Mr. Collins had a habit of contradicting Dr. Kinsel in front of staff, undermined her authority by using a male coworker to relay important information to the office, and acted disrespectfully toward the plaintiff. (DEx. 30 at 3-4). The plaintiff has not included this claim in her Amended Complaint. (See Docket No. 19).

[8] The plaintiff asserted that Mr. Collins created a hostile work environment for Christian employees by using the phrase "Jesus Christ" as an expletive in a meeting. (DEx. 30 at 4-5, 14). The plaintiff has not included this claim in her Amended Complaint either. (See Docket No. 19).

that do not include human subjects" and that the change in policy was designed to address concerns that delays in IRB approval had impacted research. (PEx. 22 at 1; DEx. 33 at 1).

Mr. Lazic separately responded to the plaintiff's letter to Dean Antman to address her allegations that Mr. Collins engaged in improper workplace behavior. (DEx. 35 at 1). He concluded that Mr. Collins did not deliberately intend to bully or harass any employee at OSP-MED, but stated that "the Office of Human Resources will work with Mr. Collins as well as with the employees at OSP-MED to improve the workplace environment." (DF ¶ 32; DEx. 35 at 2).

The EOO responded to the plaintiff on July 11, 2011 and indicated that Ms. Kirkendall chose not to interview the plaintiff for the Assistant Director position because "she did not feel it was appropriate for her to hire anyone from the OSP-MED staff[,]" since the office was already "seriously understaffed." (PEx. 13 at 2; DEx. 34 at 2). The EOO also stated that "Mr. Collins was not made aware that you had applied for the position because you were no longer a candidate when he took over . . . . Mr. Collins did not take any action with respect to your application." (PEx. 13 at 2-3; DEx. 34 at 2-3).

On June 17, 2011, the plaintiff filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD"), alleging that the defendant had discriminated against her on the basis of her sex and her association with her African-American coworkers. (PEx. 15 at 1-2; DEx. 1 at 3-4; DF ¶ 28). In her MCAD complaint, she cited the fact that she did not receive the promotion to Assistant Director of Proposal Development. (PEx. 15 at 1; DEx. 1 at 3).

On July 20, 2011, BU announced that it was consolidating the research organizations on both campuses into a single unit. (DF ¶ 33). As part of the reorganization, the plaintiff's title was changed to "Senior Research Administrator" and her salary grade changed from Grade 73

to Grade 75, increasing her salary.  (DF ¶ 34).  The plaintiff disputes this, alleging that the pay

raise she and her colleagues received was not part of a reorganization, but rather an attempt to

cover up prior wrongdoing.  (See POpp. at 5).

On September 16, 2011, Mr. Collins privately met with the plaintiff.  (DF ¶ 36; PEx. 17).

Ms. Persson subsequently supplemented her MCAD complaint based on the September 16

meeting.  (DF ¶ 37; DEx. 39).  According to her supplemental filing, during the September 16

meeting Mr. Collins raised his voice and at one point got up to shut the door.  (DEx. 39 at 1).  He

told the plaintiff that he thought she was bringing her personal feelings into the office and that

"he didn't know if what [she] was doing was intentional or subconscious."  (Id.).  Further, he

said he felt uncomfortable, and that the plaintiff needed to move on from the past.  (Id.).  The

plaintiff told him that she had been a successful employee who had worked at BU for ten years.

(Id.).  Mr. Collins responded by saying "we'll have to just see about the future here[,]" and that

he was still willing to move on, but that "we would just have to see about how it goes in the

future."  (Id.).  In her MCAD supplementation, the plaintiff stated that she believed Mr. Collins

meant that he was willing to go on if she dropped the MCAD case against him.  (Id.).

On October 11, 2014, the MCAD dismissed the plaintiff's complaint for lack of probable

cause.  (DEx. 2).  On April 16, 2015, the investigating commissioner for the plaintiff's MCAD

complaint affirmed the lack of probable cause finding.  (DEx. 3).  On May 27, 2015, the

investigating commissioner denied the plaintiff's request for full commission review of the lack

of probable cause finding.  (DEx. 4).

**Plaintiff's Leave of Absence**

After the MCAD investigative conference on September 21, 2011, the plaintiff went to see her physician.  (See PEx. 30 at 1).  The plaintiff's physician believed she was beginning to exhibit signs of PTSD related to her work situation.  (Id. at 2).  Accordingly, on or about September 23, 2011, the plaintiff applied for FMLA leave.  (DF ¶ 38).  Her leave application was granted.  (Id.).

On October 27, 2011, during the plaintiff's FMLA leave period, she received a call at home from one of her coworkers.  (DF ¶ 39).  The coworker indicated that "office management had told him to call [the plaintiff] at home to look up an email [she] would have received after [she] went out on FMLA."  (PEx. 33 at 4; DEx. 41).  The next day, the plaintiff relayed this incident to Jill Jacobs in HR.  (DF ¶ 39).  Ms. Jacobs contacted Mr. Collins to remind him that the plaintiff was relieved of work duties while on FMLA leave and that his office should not be contacting her.  (DEx. 42; DF ¶ 39).  The plaintiff received no additional phone calls from her coworkers during her FMLA leave period.  (DF ¶ 40).

According to the plaintiff, in a phone conversation during her FMLA leave period, Ms. Jacobs also brought up a settlement offer that BU had extended to the plaintiff, which would provide the plaintiff with two months of severance pay as well as the opportunity to receive unemployment insurance.  (PEx. 33 at 10; DEx. 44 at 1).

During this time period, the plaintiff also relayed to Ms. Jacobs that she had decided to leave Boston to start a new life in California.  (DF ¶ 42).  She asked Ms. Jacobs if any jobs at BU would allow for the plaintiff to work an earlier shift, and to leave in May for her move to California.  (See PEx. 33 at 4; DEx. 41).

On November 18, 2011, the plaintiff requested that her leave be extended beyond the end of her FMLA leave, which she acknowledged was set to expire on December 15, 2011, and proposed that her remaining vacation time could be used to remain on leave until the beginning of intersession at BU.  (PEx. 33 at 9).  On December 5, 2011, Ms. Jacobs provided the plaintiff with her sick day and vacation day accruals and reminded the plaintiff that her FMLA leave would expire on December 15.  (PEx. 33 at 7; DEx. 44 at 3).  Ms. Jacobs also stated that if the plaintiff would like to request an extension of her leave, she would need to submit a written request to her supervisor, Mr. Collins.  (Id.).  Ms. Jacobs offered to relay any such request to Mr. Collins on the plaintiff's behalf.  (Id.).  The plaintiff responded that Ms. Jacobs had previously informed her that she was entitled to up to 26 weeks of leave under BU policy.  (PEx. 33 at 6-7; DEx. 44 at 3).  Ms. Jacobs denied that she had told the plaintiff that the plaintiff was entitled to 26 weeks of leave.  (PEx. 33 at 5; DEx. 44 at 2-3).  Ms. Jacobs also clarified that the plaintiff did not need to provide any additional medical information to support her request unless she was requesting an extension of her leave beyond the month of December, as HR already had paperwork from the plaintiff's physician indicating that she was unable to resume work duties prior to December 31, 2011.  (Id.).  The plaintiff subsequently provided a written request asking Mr. Collins for additional leave.  (DF ¶ 44).  However, her request did not indicate how long of an extension she was seeking.  (See PEx. 33 at 10; DEx. 44 at 1).

Ms. Jacobs emailed Mr. Collins, relaying that the plaintiff was requesting to extend her medical leave until December 31, 2011.  (PEx. 33 at 15; DEx. 45 at 2).  Mr. Collins approved the extension request.  (PEx. 33 at 15; DEx. 45 at 1-2).  On January 1, 2012, the day after her leave expired, the plaintiff resigned, citing concerns "regarding [her] health and safety."  (DF ¶ 46).

**Post-Employment Activities**

The plaintiff subsequently filed a claim for unemployment insurance. (PEx. 38 at 1). On March 16, 2012, BU filed an appeal contesting the plaintiff's unemployment claim. (PEx. 38 at 2). BU asserts, but the plaintiff disputes, that this was done in error. (DF ¶ 47). BU subsequently withdrew its opposition to her unemployment claim. (Id.).

In February 2012, the plaintiff contacted the Office for Human Research Protections, within the U.S. Department of Health and Human Services ("HHS"), to report what she believed to be possible instances of violations of federal regulations at BU. (DF ¶ 48; PEx. 26; DEx. 48). HHS asked BU to evaluate the plaintiff's allegations of noncompliance, and BU issued a report on April 13, 2012 acknowledging that it had identified a research project conducted by a trainee that had been initiated with conditional approval but prior to final IRB review, in violation of 45 C.F.R. §§ 46.103(b) and 46.109(a). (PEx. 28 at 2; DEx. 49 at 2). BU provided HHS with a proposed corrective action plan for remedying the violation, which HHS determined adequately addressed the violation. (Id.). HHS noted that BU's plan for clarifying the difference between conditional and final approval would address what "appears to have been the problem which led to the regulatory violation." (Id.).

Additional factual details relevant to the court's analysis are described below where appropriate.

### III.   ANALYSIS

#### A.   Standard of Review - Summary Judgment

"The role of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" PC Interiors, Ltd. v. J. Tucci Constr. Co.,

794 F. Supp. 2d 274, 275 (D. Mass. 2011) (quoting <u>Mesnick v. Gen. Elec. Co.</u>, 950 F.2d 816, 822 (1st Cir. 1991)) (additional citation omitted).  The burden is upon the moving party to show, based upon the discovery and disclosure materials on file, and any affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'"  <u>Vineberg v. Bissonnette</u>, 548 F.3d 50, 56 (1st Cir. 2008) (quoting <u>Garside v. Osco Drug, Inc.</u>, 895 F.2d 46, 48 (1st Cir. 1990)).  "A fact is 'material' only if it possesses the capacity to sway the outcome of the litigation under the applicable law."  <u>Id.</u> (quotations, punctuation and citations omitted).

"Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue."  <u>PC Interiors, Ltd.</u>, 794 F. Supp. 2d at 275.  The opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts.  <u>LeBlanc v. Great Am. Ins. Co.</u>, 6 F.3d 836, 841-42 (1st Cir. 1993).  Accordingly, "the nonmoving party 'may not rest upon mere allegation or denials of his pleading[,]'" but must set forth specific facts showing that there is a genuine issue for trial.  <u>Id.</u> at 841 (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)).  The court affords "no evidentiary weight to conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative."  <u>Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London</u>, 637 F.3d 53, 56 (1st Cir. 2011) (internal quotation marks and citation omitted).  Rather, "[w]here, as here, the nonmovant bears the burden of proof on the disposi-

tive issue, it must point to 'competent evidence' and 'specific facts' to stave off summary judgment." Id. (citation omitted).

"Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Adria Int'l Group, Inc. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001). "'When facing cross-motions for summary judgment, a court must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56.'" Peck v. City of Boston, 750 F. Supp. 2d 308, 312 (D. Mass. 2010) (quoting Dan Barclay, Inc. v. Stewart & Stevenson Servs., Inc., 761 F. Supp. 194, 197-98 (D. Mass. 1991)). "These standards for summary judgment apply even where the plaintiff proceeds *pro se*." Niemic v. Maloney, 448 F. Supp. 2d 270, 277 (D. Mass. 2006).

**B.    Discrimination Claim**

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e–2(a)(1). Here, the plaintiff asserts that she was discriminated against, and that such discrimination primarily took the form of a lower salary, fewer benefits, an inferior employment title, and other deficient ancillary benefits.[9]

"To determine whether a plaintiff has successfully established a discrimination claim, federal and state courts rely on the burden-shifting analysis set out in *McDonnell Douglas Corp.*

---

[9] The plaintiff's retaliation claims, which pertain to the defendant's alleged failure to promote, constructive discharge, and intimidation and threats in relation to her alleged advocacy of her coworkers and as protected by the FCA, will be addressed separately below in this court's retaliation analysis.

*v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)." Espinal v. Nat'l Grid NE Holdings 2, LLC, 794 F. Supp. 2d 285, 292 (D. Mass. 2011), aff'd, 693 F.3d 31 (1st Cir. 2012). Under the McDonnell Douglas framework, a plaintiff must first establish a prima facie case of discrimination. Id. A prima facie case of racially discriminatory compensation requires that the plaintiff show that "(1) [s]he is a member of a protected class; (2) [s]he met [her] employer's expectations; (3) [s]he suffered adverse employment action with respect to compensation; and (4) similarly-situated employees outside the protected class received more favorable treatment." Prescott v. Higgins, 538 F.3d 32, 41 (1st Cir. 2008). As the court in Espinal explained:

> If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. The onus is not onerous. "In assessing pretext, a court's 'focus must be on the perception of the decision maker,' that is, whether the employer believed its stated reason to be credible." *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 824 (1st Cir. 1991). "The employer's reasons need not be wise, so long as they are not discriminatory and they are not pretext." *Tardanico v. Aetna Life & Cas. Co.,* 41 Mass. App. Ct. 443, 448, 671 N.E.2d 510 (1996). If the employer passes the test, a plaintiff must come forward with evidence showing that the employer's proffered reason is a pretext and that a discriminatory animus was at the heart of the employer's actions.

Espinal, 794 F. Supp. 2d at 292 (footnote omitted).

A number of circuits recognize associational discrimination – wherein an employee is discriminated against for his or her association with a person of a protected class – as a violation of Title VII. See Zarda v. Altitude Express, Inc., 883 F.3d 100, 124-25 (2d Cir. 2018), and cases cited (holding that associational discrimination is prohibited towards all protected classes, while noting that Fifth, Sixth, and Eleventh Circuits have recognized associational discrimination in context of racial discrimination). Although "association" is not typically defined in such cases, most involve familial connections or romantic relationships. See Holcomb v. Iona Coll., 521 F.3d

130, 138 (2d Cir. 2008) (interracial marriage); <u>Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc.</u>, 173 F.3d 988, 994 (6th Cir. 1999) (biracial child); <u>Deffenbaugh-Williams v. Wal-Mart Stores, Inc.</u>, 156 F.3d 581, 588-89 (5th Cir. 1998) (interracial relationship), <u>vacated by</u> 169 F.3d 215 (5th Cir.), <u>reinstated in pertinent part by</u> 182 F.3d 333 (5th Cir. 1999); <u>Parr v. Woodmen of the World Life Ins. Co.</u>, 791 F.2d 888, 892 (11th Cir. 1986) (interracial marriage); <u>Bergerson v. N.Y. State Office of Mental Health, Cent. N.Y. Psychiatric Ctr.</u>, 611 F. Supp. 2d 224, 230-31 (N.D.N.Y. 2009) (interracial dating); <u>Chacon v. Ochs</u>, 780 F. Supp. 680, 682 (C.D. Cal. 1991) (interracial marriage).  However, the Sixth and Seventh Circuits have rejected the idea that associational discrimination claims require an objectively quantifiable degree of association.  <u>Drake v. Minn. Mining & Mfg. Co.</u>, 134 F.3d 878, 884 (7th Cir. 1998); <u>see</u> <u>Barrett v. Whirlpool Corp.</u>, 556 F.3d 502, 513 (6th Cir. 2009).  The Seventh Circuit has held that "the key inquiries should be whether the employee has been discriminated against and whether that discrimination was 'because of' the employee's race."  <u>Drake</u>, 134 F.3d at 884 (footnote omitted).  The Sixth Circuit subsequently adopted the same reasoning, and has held that "[i]f a plaintiff shows that 1) she was discriminated against at work 2) because she associated with members of a protected class, then the degree of the association is irrelevant."  <u>Barrett</u>, 556 F.3d at 513.[10]

Here, the plaintiff appears to be advancing two possible theories of associational discrimination.  First, that she was discriminated against for advocating on behalf of her African-American coworkers.  Second, that she was discriminated against for working in an office that

_____

[10] The "zone of interests" test that the plaintiff cites in her Memorandum in Support of her Motion for Summary Judgment (Docket No. 78), pertains to statutory standing, not the issue of associational discrimination.  <u>See</u> <u>Thompson v. N. Am. Stainless, LP</u>, 562 U.S. 170, 177-78, 131 S. Ct. 863, 870, 178 L. Ed. 2d 694 (2011).

was majority African-American.[11]  The first theory pertains to her claims of retaliation, i.e., that adverse actions were taken against her for speaking out, and shall be discussed separately below.[12]  The second theory – that she was discriminated against for working in an office that was majority African-American – fails as a matter of law.

This court need not decide whether working in the same office as African-American coworkers, without more, is enough to establish an association sufficient to create a claim under Title VII, because the defendant has provided a nondiscriminatory rationale for the plaintiff's pay disparity and the plaintiff has failed to create a genuine dispute of material fact as to pretext.  Undoubtedly, there was a significant salary disparity between employees at OSP-MED and employees at OSP-CRC, as noted in the fall 2010 report on the differences between the two campuses.  (See DEx. 20 at 2).  However, the defendant has provided a legitimate alternative reason for the disparity.

The majority of positions in both offices were assigned a "grade," which determined the position's salary.  The salary grades were assigned in anticipation of searching for applicants, without a specific candidate in mind.  (DEx. 31 at 5).  Thus, at least on an individual level, initial

---

[11] The plaintiff also, belatedly, insinuates in her Memorandum in Support of her Motion for Summary Judgment that she was discriminated against for being a member of a mixed-race family and being married to an indigenous Peruvian.  (See Docket No. 78 at 3).  Persson provides no assertions, let alone evidence, in support of this claim, other than alleging that her mixed-race family "was well known to the Defendant" and that her marriage "was also well known to [the] Defendant, and evident from the family photos in her office."  (Id.).  She has put forth no facts from which a factfinder could conclude that this information was a motivating force in any actions about which she is complaining.

[12] To the extent that the plaintiff intends to advance this theory as a reason that she was discriminated against in salary and benefits, her claim fails.  The plaintiff joined OSP-MED in 2008.  Her initial salary was predetermined, and could not have corresponded with advocacy that she had yet to engage in.  By the plaintiff's own telling of events, she did not speak out about the salary disparity until 2010.  She has not alleged, let alone shown that the other white employee in OSP-MED was paid more than her, nor that her salary was negatively affected as a consequence of speaking out about the disparity.

salaries were set before applicants applied, and could not have been based on the race of the eventual hire.  As the EOO found, when determining the salary grade of open positions, HR staff on each campus did not have access to salary information from the other campus, nor did the directors of OSP.  (Id. at 4).  Further, because OSP-CRC was funded centrally by the CRC Provost's Office, salary funding stayed within the OSP-CRC budget when an employee left and could be used to fill the position and make other salary adjustments.  (Id. 4-5).  By contrast, OSP-MED was funded by the three Medical Campus Dean's Offices, and its funding was based on their annual determination of available funds, expected needs, and the percentage of services used by each school.  (Id. at 5).  When an employee left OSP-MED, those salary dollars would not stay within the department, and funds for filling the position had to be requested from the Medical Campus Provost.  (Id.).  Additionally, a number of employees at OSP-CRC had a significantly higher salary because they had worked in their positions for over ten years.  (Id.).  None of the employees at OSP-MED had met this tenure threshold.  (Id.).

The plaintiff disputes a number of these explanations.  However, "[i]t is not enough for a plaintiff merely to impugn the veracity of the employer's justification; [she] must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive . . . ."  Melendez v. Autogermana, Inc., 622 F.3d 46, 52 (1st Cir. 2010) (quotations and citations omitted) (setting out pretext standard in context of ADEA claim).  The plaintiff claims that she knows a number of OSP-MED employees who have worked there longer than OSP-CRC employees, but has failed to introduce any evidence into the record to support her assertion.  See McDonough v. Brennan, No. 16-CV-11496-DJC, 2018 WL 5777120, at *5 (D. Mass. Nov. 2, 2018) ("It is a party's obligation at

summary judgment to point to specific facts in the record to create a genuine dispute of material fact, and even for a pro se party, that burden is not met by unsupported assertions in briefing.").

The plaintiff also posits that because OSP-MED was paid less, despite receiving more grant and contract applications and issuing more awards with fewer staff than OSP-CRC in FY2010 and FY2011, this creates a genuine issue of material fact as to pretext.  (See PEx. 6). However, the plaintiff fails to address the fact that employees in the two offices were not similarly situated.  As detailed in the fall 2010 report, OSP-CRC was heavily involved in proposal development, while OSP-MED was not.  OSP-CRC also provided source numbers faster, was more familiar with financial post-award requirements, and was characterized as operating "far more effectively" than OSP-MED in the fall 2010 report.  The fact that OSP salaries were standardized in the midst of a greater effort to unify the duties and responsibilities of the two offices further bolsters the university's proffered explanation that the pay differential was due in part to the different duties and responsibilities.  In light of these differences, the mere fact that OSP-MED was paid less while processing more applications is insufficient to establish pretext.  See Moynihan v. Mass. Mut. Life Ins. Co., 773 F. Supp. 502, 514 (D. Mass. 1991) ("Statistical evidence comes 'in infinite variety' and its 'usefulness depends on all of the surrounding facts and circumstances.'" (quoting Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 996 n. 3, 108 S. Ct. 2777, 2789 n. 3, 101 L. Ed. 2d 827 (1988))).  For the same reasons, the plaintiff's claim of racial discrimination under Mass. Gen. Laws ch. 151B, § 4 must also fail.  See

Prescott v. Higgins, 538 F.3d 32, 40 (1st Cir. 2008) (noting that both Title VII claims and claims under Mass. Gen. Laws. ch. 151B are analyzed under the McDonnell Douglas framework).[13]

Accordingly, the defendant's motion for summary judgment is ALLOWED as to the plaintiff's claim of racial discrimination under Title VII and Mass. Gen. Laws ch. 151B, § 4, and the plaintiff's motion is DENIED.

### C.      False Claims Act Retaliation Claim

The First Circuit has held that an anti-retaliation claim under the FCA is also "amenable to the use of the *McDonnell Douglas* framework." Harrington v. Aggregate Indus. Ne. Region, Inc., 668 F.3d 25, 31 (1st Cir. 2012). In order to establish a retaliation claim under the FCA, an employee must "show that (i) [s]he was engaged in conduct protected under the FCA; (ii) the employer had knowledge of this conduct; and (iii) the employer retaliated against the employee because of this conduct." Id. "Once this *prima facie* showing is made, the burden shifts to the employer to provide a legitimate, non-retaliatory reason for the adverse employment action." U.S. ex rel. Thorpe v. GlaxoSmithKline PLC, 89 F. Supp. 3d 231, 234 (D. Mass. 2015), aff'd sub nom. U.S. ex rel. Hamrick v. GlaxoSmithKline LLC, 814 F.3d 10 (1st Cir. 2016). "Under this framework, a plaintiff must first make out a prima facie case that an adverse employment action was retaliatory." U.S. ex rel. Hamrick, 814 F.3d at 18.

---

[13] In support of her claim of racial discrimination, the plaintiff notes that another individual in the plaintiff's office, Lily Guo, filed an MCAD complaint alleging that she was discriminated against on the basis of being Asian-American. The plaintiff's reliance on Ms. Guo's complaint is misplaced. Ms. Guo had a separate supervisor from the plaintiff and the discriminatory conduct alleged by Ms. Guo – that she was inadequately trained on a new system and improperly accused of poor performance – does not resemble any of the allegations made by Persson. This court also has not been provided with any information as to the resolution of Ms. Guo's MCAD complaint. The record that has been provided on Ms. Guo's complaint includes extensive documentation of repeated performance issues, which formed the cited basis for her termination. This court expresses no opinion on the merits of Ms. Guo's claim, but fails to see its relevance to Ms. Persson's claims.

Here, the plaintiff claims that she was retaliated against for complaining that BU's new policy would violate regulations governing the receipt of research funds. A viable claim under the FCA requires proof of knowledge, actual or constructive, or reckless disregard of the fact that the defendant was submitting claims that were false. See United States v. President & Fellows of Harvard Coll., 323 F. Supp. 2d 151, 192 (D. Mass. 2004). Actions involving only an allegation of retaliation under the FCA, unlike actions directly alleging the submission of a false claim, need not establish evidence of an actual false claim. See Guilfoile v. Shields, 913 F.3d 178, 188 (1st Cir. 2019). Rather, it is sufficient for the plaintiff to show that "she was retaliated against based on conduct that reasonably could lead to a viable FCA action." Id. (internal quotations and citation omitted). This requires that the plaintiff-employee engage in "investigations, inquiries, testimonies or other activities that concern the employer's knowing submission of false or fraudulent claims for payment to the government." United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 237 (1st Cir. 2004), abrogated on other grounds by Allison Engine Co., Inc. v. United States ex rel. Sanders, 553 U.S. 662, 128 S. Ct. 2123, 170 L. Ed. 2d 1030 (2008).

Here, the plaintiff has failed to establish that she was engaged in protected conduct under the FCA. Although the plaintiff now alleges that once BU changed its policy for releasing source numbers, it could no longer truthfully certify that it had obeyed all relevant federal regulations when submitting claims for payment, this was not something that she alleged, investigated, or reported when she was still at BU. In other words, the plaintiff has not alleged or provided evidence that during her employment she investigated or reported whether BU had knowingly submitted false or fraudulent claims to the government. None of the plaintiff's

complaints to Dean Antman, the EOO, or MCAD make any mention of the university knowingly submitting false or fraudulent claims to the government.  Rather, the plaintiff's complaints focused on whether the defendant's change in policy could lead to regulatory violations.  "Although '[c]orrecting regulatory problems may be a laudable goal,' it is 'not actionable under the FCA in the absence of actual fraudulent conduct.'"  Id. (alteration in original) (quoting U.S. ex rel. Hopper v. Anton, 91 F.3d 1261, 1269 (9th Cir. 1996)).  Accordingly, the defendant's motion for summary judgment on the plaintiff's FCA claim is ALLOWED and the plaintiff's motion is DENIED.

### D.    Title VII Retaliation Claim

Ms. Persson alleges that the defendant retaliated against her for speaking out against racial discrimination, in violation of Title VII's anti-retaliation provision, and for speaking out about potential violations of federal regulations, in violation of the FCA.  Specifically, she alleges that the defendant retaliated against her by (1) failing to hire her to the position of Assistant Director of Proposal Development; (2) threatening and intimidating her in staff meetings, as well as private meetings; and (3) constructively discharging her.[14]

### Title VII Standard

Title VII prohibits "not only direct discrimination, but also retaliation against an individual who has complained about discriminatory employment practices."  Velazquez-Ortiz v. Vilsack, 657 F.3d 64, 72 (1st Cir. 2011).  Thus, an employer may not retaliate against "any of [its]

---

[14] At her deposition, the plaintiff appears to assert that BU also retaliated against her by initially challenging her claim for unemployment benefits.  (See DEx. 5 at 12-13).  Because BU withdrew its opposition to her claim for unemployment benefits, the plaintiff did receive such benefits, and she has not made this argument in her memoranda on the cross-motions for summary judgment, this court need not address the issue.

employees" merely because the employee "has opposed any practice" that is "an unlawful employment practice" under Title VII.  42 U.S.C. § 2000e-3(a).  A "retaliation claim may be viable even if the underlying discrimination claim is not."  Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 174 (1st Cir. 2003).  The employment practice opposed "need not be a Title VII violation so long as [the plaintiff] had a reasonable belief that it was, and [s]he communicated that belief to [her] employer in good faith."  Id. at 174-75.

Retaliation claims are also subject to the burden shifting framework of McDonnell Douglas.  To establish a prima facie case of retaliation, a plaintiff must prove that: (1) she engaged in protected conduct; (2) she was subjected to an adverse employment action; and (3) the adverse action was causally connected to the protected conduct.  Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 94 (1st Cir. 2018).

### Protected Conduct under Title VII

BU concedes that the plaintiff was engaged in protected conduct when she filed her discrimination complaint with the EOO in May 2011, as well as when she filed her MCAD complaint a month later.  See Almeder v. Town of Bourne, 922 F. Supp. 2d 160, 169 (D. Mass. 2013) ("Internal complaints and complaints filed with outside agencies, such as the EEOC, constitute protected activity.").  However, the plaintiff asserts that she was engaged in protected conduct at least as early as January 2011, when she first met Mr. Collins, if not earlier.  Ms. Persson alleges that she first complained to Mr. Collins about what she perceived to be racially discriminatory salary disparities between the employees at OSP-CRC and OSP-MED.  As detailed below, the date of protected activity is relevant because plaintiff contends that the failure to promote her and harassment at meetings in January 2011 were in retaliation

for protected conduct.  Obviously, if these events occurred before the plaintiff was engaged in protected activity, they could not have occurred in retaliation for such protected conduct.

As the First Circuit has explained, the anti-retaliation provision of Title VII provides a "very broad protective cloak."  Franchina v. City of Providence, 881 F.3d 32, 45 (1st Cir. 2018) (quotations and citation omitted).  Thus, mere "informal opposition" to a discriminatory employment activity is sufficient to constitute protected activity under Title VII.  Id.  Here, the evidence in the record clearly supports the assertion that the plaintiff complained about unequal pay between OSP-MED and OSP-CRC.  In an email to Michael Collins sent on January 26, 2011, the plaintiff explicitly wrote, as one of the listed problems with the office, "Inequity between the OSP-CRC office and the OSP-Med office."  (DEx. 21 at 3).  However, it is a much closer question whether the record could support a finding that the plaintiff told Mr. Collins she believed the pay disparity was based on racial discrimination.

The plaintiff's email to Mr. Collins in January mentions the need for "equity" between the campuses, but makes no mention of race.  Similarly, while the plaintiff's dissatisfaction with her own salary is certainly evident going back to 2009, there is no evidence in the record that the plaintiff believed racial discrimination played a role.  None of the plaintiff's formal complaints, filed as late as May and June of 2011, cite salary in reference to the plaintiff's discrimination claims.  The only sworn statement in the record to support the plaintiff's claim that she voiced concern about racial discrimination to Mr. Collins is her own deposition testimony, which was submitted in support of the *defendant's* motion for summary judgment, where Persson testified for the first and only time that during her first meeting with Mr. Collins in January, she told him that BU "needed to address the disparity in salaries and benefits

between our mostly African-American office and the all-white office on the other side[.]" (DEx. 5 at 8).[15] This evidence is insufficient to establish that the plaintiff engaged in protected activity in January 2011 by complaining about the pay disparity being based on race.

Although the plaintiff repeatedly alleges that she vocally advocated on behalf of her African-American coworkers, she has also failed to provide this court with a single affidavit or deposition from any of her coworkers to support these allegations. Indeed, the only email in the record pertaining to an interaction with a colleague, sent the day Mr. Collins began at BU, indicates that the colleague thought Ms. Persson was simply chronically dissatisfied with her own job. (See DEx. 19). The paucity of evidentiary support provided by the plaintiff simply does not create a genuine issue of material fact as to whether the plaintiff was engaged in protected conduct under Title VII prior to May 2011, when the plaintiff first filed internal complaints against Mr. Collins. Thus, the plaintiff's claims of Title VII retaliation based on failure to promote and inappropriate conduct during staff meetings cannot be sustained, as the alleged retaliatory conduct occurred months before the plaintiff engaged in protected activity. However, as detailed below, this court also concludes that even if the plaintiff's protected conduct began in January 2011, these claims fail as a matter of law.

### Materially Adverse Action

To establish the second element of a retaliation claim, the plaintiff must show that she suffered an adverse employment action. Here, the plaintiff alleges that a number of incidents constituted adverse actions. This court will address each allegation in turn.

---

[15] The EOO complaint submitted by one of the plaintiff's coworkers on January 24, 2011, as well as the letter submitted by three OSP-MED employees on May 26, 2011, both alleged that the salary disparities between the campuses had a racial basis. However, the plaintiff did not sign on to either complaint.

Employer actions that are materially adverse are those that "are 'harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" Ahern v. Shinseki, 629 F.3d 49, 55 (1st Cir. 2010) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57, 126 S. Ct. 2405, 2409, 165 L. Ed. 2d 345 (2006)). "This objective assessment 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" Id. at 55-56 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S. Ct. 998, 1003, 140 L. Ed. 2d 201 (1998) (internal quotations omitted)). Courts conduct a case-by-case inquiry to determine whether a particular action is materially adverse. See Blackie v. State of Me., 75 F.3d 716, 725 (1st Cir. 1996) (explaining standard in context of FLSA retaliation claim). However, such inquiries are still objective in nature. Id. As the First Circuit has explained, "[w]ork places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." Id.

As detailed in the plaintiff's supplemental MCAD complaint, in a meeting on September 16, 2011, Mr. Collins told the plaintiff "we'll have to just see about the future here," and said that he was still willing to move on, but that "we would just have to see about how it goes in the future." (DEx. 39 at 1). While a reasonable person could well be dissuaded from pursuing his or her MCAD complaint after being "continuously threatened with termination" for engaging in protected activity, see Rivera-Rivera, 898 F.3d at 96, a single meeting involving a vague reference to the future falls short of this standard.

The plaintiff's other allegations as to Mr. Collins's behavior, which involve admonishments directed at the OSP-MED office during staff meetings also fail to meet this standard.  In her deposition the plaintiff testified that Mr. Collins disparaged the office by saying it "did nothing right," that OSP-CRC was "kicking [OSP-MED's] ass," and that "[w]hen you walk into this office and when you walk into the other office . . . you can see the difference."  (DEx. 5 at 8, 30).  However, the plaintiff does not allege that Mr. Collins imposed disciplinary action against her, that she was singled out specifically, or that he made racist remarks.  While these words were undoubtedly harsh, an employer's "[t]rivial harms, petty slights, [and] lack of good manners" are insufficient to constitute a materially adverse action.  Pedicini v. United States, 480 F. Supp. 2d 438, 451 (D. Mass. 2007).  Nor does being unfairly reprimanded necessarily rise to the level of a materially adverse action, particularly when no disciplinary action is imposed.  See id. at 454.  Thus, without more, these allegations do not support a genuine issue of material fact as to whether Mr. Collins's disparaging comments during staff meetings constitute a viable retaliation claim.

While constructive discharge does constitute an adverse employment action, see Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47-48 (1st Cir. 1998), and cases cited, the plaintiff has failed to create a genuine dispute as to whether she was constructively discharged.  In order to establish a claim of retaliatory constructive discharge, a plaintiff must establish that his or her work environment was hostile.  Id.  In other words, that her "working conditions were so onerous, abusive, or unpleasant that a reasonable person in [her] position would have felt compelled to resign." Rivera-Rivera, 898 F.3d at 96 (internal quotations and citations omitted).  If a plaintiff does not leave her position "within a reasonable time after last

being the subject of discrimination, she cannot prevail under a constructive discharge theory." Smith v. Bath Iron Works Corp., 943 F.2d 164, 167 (1st Cir. 1991) (no constructive discharge where plaintiff did not resign until six months later).

Here, the plaintiff has not asserted a hostile work environment claim, and her resignation was preceded by three and a half months with no direct contact from Mr. Collins and only one call from a coworker. The only conduct cited by the plaintiff that occurred within proximity to her decision to take leave is (1) Mr. Collins allegedly glaring at her through a window while she supplemented her MCAD complaint and (2) the meeting on September 16, 2011. These two incidents do not constitute the kind of sustained onerous or abusive behavior necessary for a constructive discharge claim. See Rivera-Rivera, 898 F.3d at 96 (viable constructive discharge claim where employee told "over and over (and over) again" that she would be fired).[16]

Indeed, the only one of the plaintiff's allegations that constitutes an adverse employment action is the alleged failure to promote, addressed below. See Hernandez-Torres, 158 F.3d at 47 (listing "refusal[] to promote" as example of adverse employment action).[17]

### Causal Connection

The final element of a plaintiff's prima facie retaliation claim requires that the plaintiff show that her "protected activity was a but-for cause of the adverse employment action against

---

[16] For the first time in her memorandum in support of her motion for summary judgment, the plaintiff also claims that when she went to drop off her letter of resignation, she found a note on her desk saying that she was to appear in Mr. Collins's office when she returned to work. (See Docket No. 78 at 20). She claims that at that point she had no choice but to resign, for fear of continued bullying by Mr. Collins. (See id.). Yet, by her own admission, Persson had already drafted and intended to submit a letter of resignation by the time she saw the alleged note. (See id.).

[17] The plaintiff also asserts that the fact that BU chose to withdraw its opposition to her application for unemployment benefits is "proof" that she was constructively discharged. However, the mere fact that BU did not contest the plaintiff's unemployment claim falls far short of establishing a hostile work environment and resignation within a reasonable time of the last discriminatory act.

her."  Anderson v. Brennan, 911 F.3d 1, 12 (1st Cir. 2018).  "A causal connection can be demon-

strated in a number of ways, including evidence of 'differential treatment in the workplace . . .

temporal proximity of an employee's protected activity to an employer's adverse action . . . [or]

comments by the employer which intimate a retaliatory mindset.'"  Ortiz v. Fed. Bureau of

Prisons, 290 F. Supp. 3d 96, 107 (D. Mass. 2017) (quoting Mesnick, 950 F.2d at 828).  "Evidence

of disparate disciplinary treatment between similarly situated employees may also indicate

causation."  Id.

 The only evidence that the plaintiff provides in favor of her assertion that her alleged

advocacy was the but-for cause of Mr. Collins's failure to promote her is (1) her assertion that

during the same meeting where she told Mr. Collins that BU needed to address the salary

disparity he mentioned that he would be reviewing her application for the Assistant Director

position; and (2) BU's employee handbook, which indicates that "[i]n general," if an internal

candidate and an external candidates are "relatively equal with respect to their qualifications,"

the internal candidate should be preferred.  (PEx. 14 at 17).  While the plaintiff's

characterization of her meeting with Collins appears to be disputed,[18] it is not material.  The

meeting occurred on January 25, 2011, while Collins's decision to hire Monica Russell was not

made until May 9, 2011.  These two events, spaced months apart, are not sufficiently close in

time to establish evidence of causality in and of themselves.  See Clark Cty. Sch. Dist. v.

Breeden, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511, 149 L. Ed. 2d 509 (2001) ("The cases that

accept mere temporal proximity between an employer's knowledge of protected activity and

---

[18] Contrary to the plaintiff's claim that Collins told her he would be reviewing her application, the EOO found that the plaintiff was no longer a candidate for the position when Mr. Collins took over the applicant search, and that Collins did not take any action on her application.

an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." (internal quotations and citation omitted)).

The university's stated preference for internal candidates provides little help as well. The qualifications of Ms. Russell and Ms. Persson were not relatively equal. Ms. Russell had eight years of prior experience in research administration at Tufts Medical Center. Prior to her work at Tufts Medical Center, Ms. Russell worked as a grant specialist at Massachusetts General Hospital, an administrator at New England Medical Center, and a manager in the Department of Ophthalmology at Mater Misericordia Hospital. Her resume included work experience stretching back to 1977. By contrast, the plaintiff's resume only includes work experience dating back to 2000, when she began her secretarial position at BU, and primarily lists short-term legal internships, in addition to her three years of work as a research administrator. There is simply no genuine dispute of material fact as to whether these candidates' qualifications were comparable, let alone whether the plaintiff's qualifications were superior. While the plaintiff alleges that Ms. Russell was fired from her previous position, Ms. Persson provides no evidence in support of this proposition. Nor has the plaintiff alleged, let alone provided evidence, that other internal candidates were offered an interview. Accordingly, the plaintiff's retaliation claim for failure to promote cannot survive the defendant's motion for summary judgment.

For the reasons discussed, the defendant's motion for summary judgment on the plaintiff's Title VII retaliation claims is ALLOWED and the plaintiff's motion is DENIED.

E.    **Family and Medical Leave Act Claim**

In her Amended Complaint, the plaintiff asserts that the defendant (1) interfered with the exercise of her rights under the FMLA, and (2) denied the plaintiff additional leave benefits offered to its employees under BU's own leave policies.[19] (See Docket No. 19 at 14). For the reasons discussed below, the plaintiff's FMLA claim fails as a matter of law.

The FMLA entitles "eligible employees to, inter alia, 'a total of 12 workweeks of leave,' . . . for 'a serious health condition that makes the employee unable to perform the functions of [his] position.'" Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 330 (1st Cir. 2005) (alteration in original) (quoting 29 U.S.C. § 2612(a)(1)(D)). "[O]n return from such leave," the employee is entitled "(A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1). However, once the twelve-week leave period expires, so does the employee's job protection under the FMLA. Daley v. Wellpoint Health Networks, Inc., 146 F. Supp. 2d 92, 99 (D. Mass. 2001). If the employee is still medically unable to work after the end of the twelve week leave period, "he or she is no longer entitled to restoration." Bellone v. Southwick-Tolland Reg'l Sch. Dist., 915 F. Supp. 2d 187, 193 (D. Mass. 2013), aff'd, 748 F.3d 418 (1st Cir. 2014).

"An employer is prohibited from interfering with, restraining, or denying the exercise of (or attempts to exercise) any rights provided by the Act." 29 C.F.R. § 825.220(a)(1). Thus, a

---

[19] The plaintiff also makes claims as to constructive discharge, but these are addressed separately in the retaliation section, as the plaintiff does not assert that she was constructively discharged on the basis of exercising her FMLA rights, but rather on the basis of engaging in protected conduct under Title VII and the FCA.

plaintiff may make an interference claim under the FMLA if her employer denies her substantive rights provided by the FMLA.  Knidel v. T.N.Z., Inc., 211 F. Supp. 3d 382, 393 (D. Mass. 2016).  For such claims, the relevant issue "is simply whether the employer provided its employee the entitlements set forth in the FMLA—for example, a twelve-week leave or reinstatement after taking a medical leave."  Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 159 (1st Cir. 1998).

Here, the plaintiff asserts that the defendant interfered with her substantive rights under the FMLA by calling her during her leave period.  Specifically, the plaintiff claims that the call she received from a coworker asking if she could locate an email, as well as the call she received from Ms. Jacobs about a settlement offer from BU, interfered with her FMLA leave. (See Docket No. 78 at 17-19).  To be sure, an employee's "ability to take FMLA leave is not conditioned upon the willingness of an employee to remain 'on call' to the employer."  Sherman v. AI/FOCS, Inc., 113 F. Supp. 2d 65, 70 (D. Mass. 2000).  Here, however, the plaintiff does not claim that she was "on call" or otherwise required to work while on leave.  See id. at 70-71 (finding direct evidence of FMLA interference where employer expected plaintiff to work throughout her FMLA leave and terminated her for failing to do so).  She alleges no more than that she received two calls from work, only one of which pertained to her job duties and simply asked her to locate an email.  See Massey-Diez v. Univ. of Iowa Cmty. Med. Servs., Inc., 826 F.3d 1149, 1158–59 (8th Cir. 2016), and cases cited ("For purposes of summary judgment, courts have drawn the line along a distinction between, on the one hand, receiving nondisruptive communications such as short phone calls requesting the employee to pass on institutional knowledge or property as a professional courtesy, and, on the other, requiring the employee to

complete work-related tasks or produce work product."); <u>Reilly v. Revlon, Inc.</u>, 620 F. Supp. 2d 524, 537 (S.D.N.Y. 2009) ("Fielding occasional calls about one's job while on leave is a professional courtesy that does not abrogate or interfere with the exercise of an employee's FMLA rights.  When limited to the scope of passing on institutional knowledge to new staff, or providing closure on completed assignments, employers do not violate the FMLA by making such calls.").  Indeed, after reporting the first call, the plaintiff received no further calls from her coworkers, and only one additional call from HR.  The call from HR concerned a settlement offer, not her workplace duties.  As a matter of law, the plaintiff has failed to demonstrate that these calls interfered with the exercise of her FMLA rights.

The plaintiff also asserts a claim under the FMLA for BU's failure to grant her additional leave.  The plaintiff contends that Ms. Jacobs told her she was eligible for up to 26 weeks of medical leave.  She further contends that BU was required to provide her with additional leave pursuant to FMLA regulations.  In support of this assertion, the plaintiff cites 29 C.F.R. § 825.700(a), which states that "[a]n employer must observe any employment benefit program or plan that provides greater family or medical leave rights to employees than the rights established by the FMLA."  The plaintiff claims that BU failed to observe its own employment benefit program, as the maximum period of medical leave possible under BU's internal policy is six months.  (<u>See</u> PEx. 14 at 61).

As an initial matter, it is not clear that the regulation that the plaintiff relies on can provide her with a cause of action under the FMLA.  <u>See</u> <u>Dolese v. Office Depot, Inc.</u>, 231 F.3d 202, 203 (5th Cir. 2000) (". . . lower courts have uniformly interpreted [29 C.F.R. § 825.700] as not providing a cause of action under the FMLA; to the extent that the regulation does so, it is

invalid." (footnotes omitted)); <u>Weidner v. Unity Health Plans Ins. Corp.</u>, 606 F. Supp. 2d 949, 956 (W.D. Wis. 2009); <u>Miller v. Personal-Touch of Va., Inc.</u>, 342 F. Supp. 2d 499, 512 (E.D. Va. 2004), <u>aff'd,</u> 153 F. App'x 209 (4th Cir. 2005) ("violation of an employer's internal policy does not itself support a statutory FMLA violation"); <u>Holmes v. e.spire Commc'ns</u>, 135 F. Supp. 2d 657, 666-67 (D. Md. 2001); <u>Rich v. Delta Air Lines, Inc.</u>, 921 F. Supp. 767, 773 (N.D. Ga. 1996) ("Because the FMLA itself neither expressly or impliedly gives the Department of Labor the authority to create a federal cause of action based upon a voluntary employee program, any regulations promulgated by the Department creating such a cause of action would be invalid.").

Even assuming, <u>arguendo</u>, that the regulation provides a cause of action under the FMLA for an employer's failure to adhere to its own policy, and assuming, <u>arguendo</u>, that the cited passage of BU's handbook entitles employees to six months of leave, the plaintiff has failed to create a genuine issue of material fact as to whether BU flouted its own employment benefit program. BU's internal policies require that employees seeking a medical leave of absence must make such requests in writing with the specific dates of the leave period being requested. (<u>See</u> PEx. 14 at 60). In accordance with this policy, Ms. Jacobs informed the plaintiff of the requirements for seeking additional, non-FMLA leave – namely, a written request and additional medical information if the plaintiff sought leave beyond December 31. (DEx. 44 at 2). The plaintiff subsequently provided Ms. Jacobs with a written request to extend her leave but did not specify the dates of leave sought. (<u>See</u> <u>id.</u> at 1). Nor did her request include additional medical information. (<u>Id.</u>). Thereafter, Ms. Jacobs relayed to Mr. Collins that the plaintiff was seeking to remain on leave until December 31. (DEx. 45). The request was approved. (<u>Id.</u>). No evidence in the record indicates that the plaintiff made a written request for leave to a date

certain beyond December 31, let alone that such leave was denied. Indeed, the one request for non-FMLA leave that the plaintiff did make was approved. Thus, regardless of whether the plaintiff was originally told that she could take up to 26 weeks of leave, the record does not support the existence of a genuine issue of material fact as to whether BU failed to observe its own employment benefit program. Cf. Martin v. Stericycle, Inc., 389 F. Supp. 2d 131, 135 (D. Mass. 2005) (noting, in context of claim alleging retaliation on the basis of employer's denial of vacation time, that the plaintiff "cannot now claim that the defendants acted improperly by failing to grant a privilege that was never sought").

Lastly, in a July 19, 2018 hearing before this court on the cross-motions for summary judgment, the plaintiff also asserted that BU had a "duty to try to find some way of allowing [her] to come back in a manner that didn't subject [her] to further bullying on the part of Mr. Collins." While employees are entitled to restoration at the end of their FMLA leave period, they are not so entitled if their leave extends beyond the end of the FMLA leave period, as occurred here. See Daley, 146 F. Supp. 2d at 99. Accordingly, the plaintiff's motion for summary judgment on her FMLA claim is DENIED and the defendant's motion for summary judgment on the FMLA claim is ALLOWED.

## IV.   CONCLUSION

For the reasons detailed above, the defendant's "Motion for Summary Judgment" (Docket No. 73) is ALLOWED and the "Plaintiff's Motion for Summary Judgment" (Docket No. 77) is DENIED.

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge

-41-